In the Matter of Cromwell Towers Redevelopment Co., Appellant, v City of Yonkers et al., Respondents.—In a proceeding pursuant to CPLR article 78 *inter alia* to review administrative actions and determinations of the respondent City of Yonkers (City) in imposing its real property taxes for the fiscal years 1973–1974 and 1974–1975, which determinations also resulted in the calculation of the 1974 and 1975 County of Westchester (County) real property taxes, petitioner appeals from a judgment of the Supreme Court, Westchester County, dated July 3, 1975, which dismissed the petition. Judgment affirmed, without costs. This proceeding was instituted by a notice of petition dated March 17, 1975. On May 31, 1973 and June 8, 1974 the respondent City, acting through its city council, confirmed and assessed the taxes embraced in its assessment rolls, which included taxes on petitioner, for the city fiscal years July 1, 1973–June 30, 1974 and

July 1, 1974–June 30, 1975, respectively. These determinations were also used by the City as the bases for computing the taxes owed by petitioner to the County for its tax years 1974 and 1975. (The City acts as the collecting agent for the County.) Petitioner was aware of these determinations. The instant proceeding was therefore commenced more than four months after the Yonkers City Council's determinations of May 31, 1973 and June 8, 1974 and was time barred by the applicable Statute of Limitations (CPLR 217). On appeal, petitioner relies on section C 8-5 of the City Charter of the City of Yonkers to support its position that the proceeding herein was timely brought. That section provides: "The City Council may correct, cancel or remit any tax believed by it to have been erroneously assessed, and may remit, cancel or adjust the interest or penalty on any such tax, but it shall have no power to alter any valuations made by the City Assessor." According to petitioner, this section provided it with an independent administrative remedy for securing a refund for a tax erroneously placed on exempt property. On January 20, 1975 petitioner submitted a supplemental petition to the city council for a refund; on January 28, 1975, the city council referred the petition to the Corporation Counsel, who advised the city council, by a memorandum dated January 28, 1975, that the council was "powerless to grant [petitioner] Cromwell Towers the relief it seeks." While the record does not disclose how and when petitioner was apprised of the contents of that memorandum or whether the city council adopted the views set forth therein, petitioner contends that this legal opinion is, at best, the earliest official action taken by the City on its petition. It therefore contends that the article 78 proceeding was commenced within the four-month period prescribed by CPLR 217. We disagree. Even were we to accept petitioner's argument, it is our view that it was guilty of laches in first making its application to the Yonkers City Council on January 20, 1975, 22 months and 9 months, respectively, after the determinations of the City Council of May 31, 1973, and June 8, 1974 (see, *Austin v Board of Higher Educ. of City of N. Y.,* 5 NY2d 430, 442). Finally, the record indicates that petitioner had submitted a similar petition to the city council on October 17, 1974 which was marked "filed" by the council at its meeting of October 22, 1974. The record further indicates that, in November, 1974, petitioner sent the Yonkers Corporation Counsel a draft of a proposed petition in an article 78 proceeding wherein petitioner acknowledged that the city council had denied the relief sought in its petition of October 17, 1974. This acknowledgment could only have referred to the city council's action of October 22, 1974 in "filing" the petition. Nevertheless, petitioner did not institute an article 78 proceeding to review that action until almost five months later, after the applicable Statute of Limitations (CPLR 217) had run. Instead, it tried to extend its time to institute the article 78 proceeding by filing a supplemental petition with the Yonkers City Council on January 20, 1975. Accordingly, the proceeding herein was properly dismissed. Martuscello, Acting P. J., Latham, Margett and Brennan, JJ., concur; Shapiro, J., dissents and votes to reverse the judgment and grant the petition, with the following memorandum: In this article 78 proceeding, petitioner, a redevelopment corporation, seeks to (1) review the administrative actions and determinations of the City of Yonkers (the City) in imposing its real property taxes for the years 1973–1974 and 1974–1975 based on the assessed valuation of the partially completed buildings of petitioner's low and middle-income redevelopment project, as well as the 1974 and 1975 County of Westchester (the County) real property taxes, which were based on the same assessed valuation, (2) enjoin respondents from attempting to collect such

taxes, (3) declare petitioner partially exempt from taxes, (4) compel respondents to recompute petitioner's taxes for those years in accordance with the law and an existing contract between petitioner and the City and (5) return to petitioner the excess 1973–1974 taxes it paid under protest to the City and the excess 1974 taxes it paid under protest to the County. Special Term dismissed the petition; this court is affirming that dismissal. I believe that petitioner is entitled to the relief it seeks and I therefore vote to reverse the judgment appealed from.

## THE ISSUES

The preliminary and procedural issue is whether this article 78 proceeding is time-barred by the provisions of CPLR 217. The substantive question is whether respondents could properly tax petitioner on the increased value of its real property during the years in which the project was under construction, but prior to its completion and the occupancy of its residential facilities by eligible occupants.

## BACKGROUND FACTS

Petitioner, a limited partnership, was formed in 1971 as a "redevelopment company" pursuant to the provisions of article 5 of the Private Housing Finance Law. As such, it was able to construct low and moderate-income housing developments in the City with Federally-aided mortgage financing and rent subsidies, as provided for in the Federal Housing and Urban Development Corporation Law. To enable it to carry out this project it had to obtain a Federally-insured mortgage from the Federal Housing Administration (FHA). As a condition of granting the necessary mortgage insurance and other Federal aid, the FHA insisted that the City grant petitioner tax abatement for the term of the mortgage in accordance with the applicable provisions of section 125 of the Private Housing Finance Law. That section provides, in relevant part (subd [1], par [a]): "The local legislative body of any municipality in which a project of such company is or is to be located may by contract agree with any redevelopment company to exempt from local and municipal taxes * * * all or part of the value of the property included in such project which represents an increase over the assessed valuation of the real property, both land and improvements, acquired for the project at the time of its acquisition by the redevelopment company which originally undertook the project and for such definite period of years as such contract may provide except that where the real property in a project was acquired for purposes of rehabilitation, the local legislative body either may utilize the foregoing formula or may agree to exempt from such taxes all or part of the value of the property included in such project on condition that the amount of such taxes to be paid shall not be less than ten percentum of the annual shelter rent or carrying charges of such rehabilitation project. The tax exemption shall not operate for a period of more than twenty-five years, commencing in each instance from the date on which the benefits of such exemption first became available and effective; * * * and provided further that with respect to a project which is or is to be permanently financed by a federally-aided mortgage, the tax exemption shall operate for so long as such mortgage is outstanding, but in no event for a period of more than forty years, commencing in each instance from the date on which the benefits of such exemption first became available and effective." On June 1, 1971 petitioner applied to the Mayor and City Council of the City for tax exemption for its proposed project "from local and municipal taxes, other than assessments for local improvements to all or part of

the value of the property included in such project which represents an increase over the assessed valuation of the real property, both land and improvements, acquired for the project at the time of its acquisition by the petitioner-redevelopment company (excepting that portion of the project allocated for commercial occupancy), and that the redevelopment company pay in lieu of taxes ten per cent (10%) of the gross shelter rents as defined in Section 33.1(a) of Article II of the Private Housing Finance Law of the State of New York, which tax exemption and in-lieu-of-tax payments to the City of Yonkers will continue for so long as the federally-aided mortgage is outstanding, but in no event for a period of forty (40) years [sic] commencing from the date on which the benefits of such exemption first became available and effective." Thereafter the Yonkers City Council, on July 6, 1971, adopted Resolution No. 323-1971 which, after declaring that "the proposed project is necessary as a relocation source in connection with the Yonkers Urban Renewal Development Program", resolved, in pertinent part: "1. That upon completion of the construction of the project * * * and pursuant to the provisions of Section 236 of the National Housing Act and Regulations thereunder * * * the aforesaid premises in the redevelopment project to be constructed * * * be exempt from * * * local improvements to the extent 100% of the value of the property included in such project (except as aforesaid [the portion allocated for commercial use]) which represents an increase over the assessed valuation of the aforesaid real property, both land and improvements, acquired for the aforesaid project at the time of its acquisition by the Redevelopment Company, pursuant to Section 125 of Article V of the Private Housing Finance Law of the State of New York as amended, and pursuant to the terms and conditions of this resolution; such tax exemption to operate for so long as the Redevelopment Company's 'federally aided mortgage' (as said term is defined in Section 102 of Article V of the Private Housing Finance Law of the State of New York, as amended), on said project is outstanding, but in no event for a period of more than 40 years from the date on which the benefits of such exemption first became available and effective. In lieu of such taxes the Redevelopment Company shall pay ten (10%) percent of the gross shelter rents as defined in Section 33.1(a) of Article II of the Private Housing Finance Law of the State of New York, as amended." Paragraph 3 of that resolution provided: "3. Pursuant to Section 125 of the Private Housing Finance Law of the State of New York, as amended, the City Manager is hereby authorized to enter into a contract with the Redevelopment Company to give effect to this resolution." On August 25, 1971 a contract was entered into between petitioner and the City which provided, in part: "1. The City of Yonkers hereby grants to the Housing Company [the petitioner redevelopment company] an exemption from all local and municipal taxes, other than assessments for local improvements, to the extent of one hundred (100%) per cent of the value of the Real Estate (land and improvements thereon) included in such Housing Project which represents an increase over $79,300 (the assessed valuation of the Real Estate, both land and improvements, acquired for such Housing Project at the time of its acquisition by the Housing Company); provided that the amount of such taxes shall not be less than ten (10%) per cent of the annual shelter rent of such Housing Project. As used in this Agreement, the term 'shelter rents' shall be as that term is defined in Section 33.1(a) of Article 2 of the Private Housing Finance Law of the State of New York, as amended. 2. Such tax exemption shall operate for so long as the Housing Company's 'federally aided mortgage' (as said term is defined in Section 102 of Article V of the Private Housing Finance Law of the State of New York,

as amended) on the Housing Project is outstanding, but in no event for a period of more than forty (40) years from the date on which the benefits of this tax exemption first become available and effective." The Yonkers City Council's resolution, and the contract signed pursuant thereto granting a 100% tax exemption, served also, under subdivision (c) of section 125 of the Private Housing Finance Law, to grant similar exemption to petitioner from the real property taxes imposed by the County on the value of the property included in the project which represented an increase over the assessed valuation of the real property acquired for the project at the time of its acquisition by petitioner. Section 125 (subd [1], par [c]) provides: "Where a municipality acts on behalf of another taxing jurisdiction in assessing real property for the purpose of taxation, or in levying taxes therefor, the said agreement by the local legislative body of such municipality shall have the effect of exempting the real property in a project from local and municipal taxes, other than assessments for local improvements, levied by or in behalf of both such taxing jurisdictions." For tax purposes, the City acts not only in its own behalf but also on behalf of the County in assessing the real property here involved. On November 29, 1971 a commitment contract for the petitioner's mortgage of $12,275,000 was signed by the Government National Mortgage Association and guaranteed by the Federal National Mortgage Association. On December 20, 1971 a mortgage note, in the same sum, was issued by petitioner, which thereafter began construction of the project. On February 14, 1974 the City issued a temporary certificate of occupancy, thereby evidencing the substantial completion of the project, although a final certificate of occupancy was not issued until May 9, 1974. Despite the contract granting tax exemption to petitioner, the City Assessor, pursuant to the requirement of section C 8-2 of the City Charter of the City of Yonkers, which directed him to assess property by way of an assessment roll to be completed by January 29 of each year, "which date shall be the taxable status date in the City of Yonkers for the purpose of real estate property taxation", assessed petitioner's then partially completed project at $904,300 for the fiscal year July 1, 1973 to June 30, 1974 and computed the tax due thereon at $64,915.31, payable quarterly. Petitioner paid the first quarterly installment on July 24, 1973, although it declared in a letter accompanying the check, "Our submission of payment should not be considered as acceptance of the property valuation which we feel may be contrary to City Council Resolution Number 323-1971." Petitioner later paid the remaining quarterly installments of the 1973–1974 tax. Despite the contract and petitioner's payment of the 1973–1974 year's tax under protest, the City Assessor, in January, 1974, fixed petitioner's assessment at $2,765,700 and computed the tax due from it for the fiscal year 1974–1975 at $199,720.68. The City also determined the taxes due the County for the calendar year 1975 on the same basis. Petitioner refused to pay those taxes. On October 17, 1974 petitioner submitted a petition to the Mayor and the City Council seeking cancellation of the taxes assessed upon it for the tax year 1974–1975 on the ground that, according to the Department of Housing and Urban Development, its project had been completed on February 1, 1974, a date prior to the City Council's confirmation of the assessment. Although the petition failed to cite the section of the City Charter which authorized the use of the petition procedure, it did allege: "The Charter of the City of Yonkers provides that your Honorable Body may cancel real estate taxes erroneously assessed and it appears to the undersigned that the Resolution of the City Council aforementioned [Resolution No. 323-1971], previously adopted by you and the agreement in connection therewith having been

executed on February 1, 1974, prior to the confirmation of the City Tax Rolls makes the said assessment a manifest error which must be corrected." Examination of the City Charter discloses that petitioner's October 17, 1974 application to the city council was based on section C 8-5 of the City Charter which provides: "5. The City Council may correct, cancel or remit any tax believed by it to have been erroneously assessed, and may remit, cancel or adjust the interest or penalty on any such tax, but it shall have no power to alter any valuations made by the City Assessor." Petitioner's October 17, 1974 petition was marked "filed" by the council at its meeting of October 22, 1974. On January 20, 1975 petitioner submitted a supplemental petition to the Mayor and city council in which, in addition to requesting cancellation of all interest and penalties "attributable to the late payment of taxes erroneously confirmed and assessed for fiscal year 1974–1975 upon the real property in question", it sought refund of the sum of $59,222.75, "the difference between $64,915.31 in taxes on real property which were erroneously assessed for the fiscal year 1973–1974, and which it paid under protest, and $5,692.56, the amount which should have been confirmed and assessed as a tax on its real property in fiscal year 1973–1974, based on a valuation of $79,300.00." Accompanying petitioner's supplemental petition was a memorandum which made it clear that by its original and supplemental petition, both submitted pursuant to section C 8-5 of the City Charter of the City of Yonkers, petitioner was seeking correction of what it characterized as the erroneous assessment of taxes on its real property for the 1973–1974 and 1974–1975 tax years. The city council, at its January 28, 1975 meeting, referred the supplemental petition to the Corporation Counsel. The city council not having approved or disapproved either the petition or the supplemental petition, petitioner, on March 17, 1975, initiated this article 78 proceeding. The answer of the City in addition to denials, interposed two defenses. The first was that the proceeding was not timely commenced under CPLR 217, which requires an article 78 proceeding to be commenced within four months after the determination complained of becomes final. The second was that under Resolution No. 323-1971 petitioner was entitled to tax exemption only "upon completion of the construction of the project" and that, according to the petition itself, the construction was not completed until "in or about February, 1974", which was after January 29, 1974, the taxable status date for real estate property taxation purposes under the City Charter. Therefore, claimed the City, it was proper to tax petitioner on the total value of its real property on that date. The answer of the County, the other respondent, in addition to denials, also interposed the defense of the four-month period of limitation and additional defenses based on the fact that any relief given petitioner would have to come from action by the City, not the County, since the taxes in question were based on the City's assessed valuations and were billed and collected by the City. Special Term, in its opinion, dismissed the petition as time-barred under CPLR 217, stating that petitioner maintained that the final determination from which the four-month period prescribed in that section was measured was a memorandum dated January 28, 1975 from the City's Corporation Counsel to the city council. That memorandum advises the council that petitioner, under Resolution No. 323-1971, was not entitled to tax exemption until completion of the construction of the project and that, since completion occurred after the City's taxable status date, January 29, petitioner "was entitled to no exemption for fiscal 1974–1975." In that memorandum, the Corporation Counsel also pointed out that petitioner "has the right to challenge the City's determination in Court" but that it had elected instead to petition the

counsel for "redress". The record does not show how and when petitioner was apprised of the contents of the January 28 memorandum or whether the views expressed therein by the Corporation Counsel were adopted by the city council. Hence, if petitioner is correct in its contention that its right of action against the imposition on it of real property taxes based upon the increased assessed valuation of its partially constructed project did not arise until the rejection by the city council of its petition under section C 8-5 of the City Charter (an event which apparently never took place), it is clear that the instant proceeding was timely commenced. Special Term, however, rejected this contention. Citing no authority, it declared: "Section C 8-5 of the Yonkers City Charter is merely authority pursuant to which the City can lawfully reimburse a taxpayer for taxes and/or penalties held erroneously assessed by an order of a competent court. Nowhere in that section is there any authority for a claimed aggrieved taxpayer to unilaterally initiate a proceeding, either by complaint or petition, seeking correction, cancellation or remission of any tax believed erroneously assessed or paid." There is no language in section C 8-5 to sustain Special Term's conclusion that its applicability is limited to cases in which there has been a prior holding by a court that the tax in question was erroneously assessed. The section authorizes the city council to "correct, cancel or remit any tax believed by it to have been erroneously assessed" (emphasis supplied). Here, there was no issue as to the correctness of the dollar amount of the assessed valuation. The only issue was whether, regardless of the City Assessor's valuations, there was legal error in the imposition and collection of the tax when, under the council's contract with petitioner, it had granted it "an exemption from all local and municipal taxes * * * to the extent of one hundred (100%) per cent of the value of the Real Estate (land and improvements thereon) included in such Housing Project which represents an increase over $79,300 (the assessed valuation of the Real Estate, both land and improvements, acquired for such Housing Project at the time of its acquisition by the Housing Company)". Read literally, section C 8-5 covers just such situations as the one here under consideration where the contention is that the council erred in imposing any tax at all on the increased value resulting from the improvements placed on the real property by the petitioner redevelopment company in building its Federally-aided residential project. The position taken by Special Term—that the city council may take action under that section only *after* a competent court has first found error in the imposition of the taxes and/or penalties which a petitioner under the section seeks to have undone—completely nullifies the language in the section specifically authorizing the city council to take corrective action when *it* believes the tax was erroneously assessed. The trigger for action under the section is the *city council's belief* that the tax was erroneously assessed, not a court's *prior* finding to that effect. If there were a requirement for such a *prior* finding, there would be no need to invoke section C 8-5; the court could itself remedy the error. Requiring a prior court finding of error makes section C 8-5 redundant and emasculates its purpose and intent. Nor can the fact that section C 8-5 contains no procedural provisions for its invocation serve to nullify it. In the absence of a specified procedure, a taxpayer who claims that it is error to assess a tax against real property it owns, based on some ground other than error in the determination of the assessed valuation, could apply to the city council under the section for a redress of the error by exercising his right of petition to call the claimed error to its attention and to request from it an appropriate correction, cancellation or remission of the erroneously assessed tax. Only if the error,

unlike that claimed by the petition to have occurred here, is with respect to the City Assessor's valuation of the real property, a matter not in issue here, do the procedures set forth in section 556 and article 7 of the Real Property Tax Law, which govern corrections of assessments and judicial review of such assessments, become applicable. Since the parties here are not in disagreement as to the correctness of the assessed valuation of petitioner's partially completed project on the taxable status day, January 29, the procedures of the Real Property Tax Law for attacking the correctness of the amount of an assessor's valuation are inapplicable. Neither the cases decided under the City Charter nor the briefs of the parties reveal any previous judicial rulings construing section C 8-5. Hence, interpretation of the text of that section must be based solely on its language, which, on its face, unambiguously negates the conclusion reached by Special Term as to its unavailability to petitioner. I conclude, therefore, that the holding of Special Term that the petition must be dismissed as untimely filed was erroneous and should be reversed. The question remains, however, whether, under Resolution 323-1971 and the consequent contract between petitioner and the City of Yonkers, petitioner states a cause of action for rescission of the 1974–1975 tax and remission to it of the taxes it paid under protest for 1973–1974 on the increase in value of the real property on which it was constructing its Federally-aided project. This requires a resolution of the apparent conflict between the language of the resolution which provides "that upon completion of the construction of the project * * * and pursuant to the provisions of Section 236 of the National Housing Act and Regulations thereunder * * * the aforesaid premises in the redevelopment project to be constructed * * * be exempt from local and municipal taxes * * * to the extent 100% of the value of the property included in such project * * * which represents an increase over the assessed valuation of the aforesaid real property * * * acquired for the aforesaid project at the time of its acquisition by the Redevelopment Company, pursuant to Section 125 of Article V of the Private Housing Finance Law of the State of New York" and the language of the contract authorized by that resolution, which provides that "the City of Yonkers hereby grants to the Housing Company an exemption from all local and municipal taxes * * * to the extent of one hundred (100%) per cent of the value of the Real Estate (land and improvements thereon) included in such Housing Project which represents an increase over $79,300 (the assessed valuation of the Real Estate, both land and improvements, acquired for such Housing Project at the time of its acquisition by the Housing Company)". The contract, although tracking much of the language of the resolution, omits any reference to its opening words, "that upon completion of the construction of the project". The question to be decided, therefore, is the meaning of that phrase. It is relevant in this connection that both Resolution 323-1971 and the contract between petitioner and the City provide that, in lieu of taxes, the housing company shall pay the City 10% of the housing project's gross shelter rents as defined in section 33 (subd 1, par [a]) of the Private Housing Finance Law. That section provides, in relevant part: "Upon the consent of the local legislative body of any municipality in which a project is or is to be located, the real property in a project shall be exempt from local and municipal taxes * * * to the extent of all or part of the value of the property included in such project which represents an increase over the assessed valuation of the real property, both land and improvements, acquired for the project at the time of its acquisition by the limited-profit housing company, provided, however, that the real property in a project acquired for purposes of

rehabilitation shall be exempt to the extent of all or part of the value of the property included in such project, and further provided that the amount of such taxes to be paid shall not be less than ten per centum of the annual shelter rent or carrying charges of such project * * *. Shelter rent shall mean the total rents received from the occupants of a project less the cost of providing to the occupants electricity, gas, heat and other utilities. The tax exemption shall operate and continue so long as the mortgage loans of the company are outstanding, but in no event for a period of more than thirty years, commencing in each instance from the date on which the benefits of such exemption first become available and effective." Since such shelter rents could not become available until after the project was completed and became available for occupancy by its tenants, who would then begin to pay rents to the housing company, it would seem that the opening resolution language, "that upon completion of the construction of the project", can mean only that the payment of 10% of the shelter rent in lieu of taxes is not to commence until completion of the construction of the project. To read the clause as the City contends it should be read, i.e., as allowing it to collect taxes on the increase in value of petitioner's real property resulting *from the partial construction of its project during the years prior to its completion,* is to ignore the language of both the resolution and the contract that such tax exemption shall operate for so long as the petitioner's " 'Federally aided mortgage' (as said term is defined in subdivision 5 of section 102 of article 5 of the Private Housing Finance Law of the State of New York, as amended)" on the project is outstanding. Also relevant to this question is a consideration of the effect of allowing the City to impose upon and collect from petitioner taxes for 1973–1974 and 1974–1975 based upon the increased value of the project's real estate resulting from the erection of the partially completed project's building or buildings during that period. (It is noteworthy that the City concedes that the project will, in the future, be exempt from taxation under the resolution and the contract now that it has been [as of February, 1974] completed.) Clearly, the collection of these taxes will impose on petitioner what is, in effect, a tax on the buildings resulting from its use of the Federally-aided mortgage funds to erect the project; they will thereby be avoiding the goal of the resolution and contract, to avoid taxing the product of the Federally-aided mortgage programs except to the extent of 10% of the shelter rents collected by the petitioner after it has completed the construction of its project and has rented the housing accommodations therein to those eligible to occupy them. The result would be to negate the policy of waiving local and municipal taxes on such projects for the purpose of encouraging their construction and instead limiting such taxes to a maximum of 10% of the shelter rents paid by the occupants of such projects. Furthermore, allowing such taxation would conflict with the policy declared in the State statute authorizing such exemptions (Private Housing Finance Law, § 101)[1] and in the Federal statute.[2] Hence, I conclude

1. Section 101 of the Private Housing Finance Law reads as follows: "It is hereby declared that in certain areas of municipalities located within this state there exist substandard conditions and insanitary housing conditions owing to obsolescence, deterioration and dilapidation of buildings, or excessive land coverage, lack of planning, of public facilities, of sufficient light, air and space, and improper design and arrangement of living quarters; that there is not in such areas a sufficient supply of adequate, safe and sanitary dwelling accommodations properly planned and related to public facilities; that modern standards of urban life require that housing be related to adequate and convenient public facilities; that the aforesaid substandard and

that the proper interpretation of the resolution and contract here under examination is that the City and the County were without power to tax petitioner on the increase in the assessed valuation of its project arising from the increase therein resulting from the partial construction of its

---

insanitary conditions depress and destroy the economic value of large areas and by impairing the value of private investments threaten the sources of public revenues; that the public interest requires the clearance, replanning, reconstruction and neighborhood rehabilitation of such substandard and insanitary areas, together with adequate provision for recreational and other facilities incidental and appurtenant thereto according to the requirements of modern urban life and that such clearance, replanning, reconstruction and neighborhood rehabilitation are essential to the protection of the financial stability of such municipalities; that in order to protect the sources of public revenue it is necessary to modernize the physical plan and conditions of urban life; that these conditions cannot be remedied by the ordinary operations of private enterprise; that provision must be made to encourage the investment of funds in corporations, partnerships and trusts engaged in providing redevelopment facilities to be constructed according to the requirements of city planning and in effectuation of official city plans and regulated by law as to profits, dividends and disposition of their property or franchises; that provision must be made to enable insurance companies to provide such facilities, subject to regulation by law as to the return from such facilities and the disposition of property acquired for such purpose; and that provision must also be made for the acquisition for such corporations, partnerships and trusts and companies at fair prices of real property required for such purposes in substandard areas and for. public assistance of such corporations, partnerships and trusts and such companies by the granting of partial tax exemptions; that the cooperation of the state and its subdivisions is necessary to accomplish such purposes; that the clearance, replanning and reconstruction, rehabilitation and modernization of substandard and insanitary areas and the provision of adequate, safe, sanitary and properly planned housing accommodations in effectuation of official city plans by such corporations, partnerships and trusts and such companies in these areas are public uses and· purposes for which private property may be acquired for such corporations, partnerships and trusts and such companies and partial tax exemption granted for such corporations, partnerships and trusts and such companies; that these conditions require the creation of the agencies, instrumentalities, corporations, partnerships and trusts hereinafter prescribed for the purpose of attaining the ends herein recited; and the necessity in the public interest for the provisions hereinafter enacted is hereby declared as a matter of legislative determination."

2. See, 1968, US Code Cong & Admin News, Housing and Urban Development Act of 1968, House Report No. 1585, pp. 2873, 2897–2898, which declares: "The success of the new section 236 rental and cooperative housing program will depend to a great extent on local communities taxing projects which will be financed under this program realistically, taking into consideration the intent of these projects to provide housing for low and moderate income families. It has recently come to the committee's attention that similar type projects financed under the FHA 221(d) (3) program have been subjected to high tax assessments inconsistent with the purpose of the program. The committee commends those States which now provide tax abatement and hopes that States and municipalities will exercise restraint in assessing these types of properties and to provide, where possible, for tax abatement and other tax reduction methods which recognize the important purpose of these programs. It therefore urges that the States and their localities take action along these lines so that the effort to provide adequate housing for the Nation's low and moderate income families will be a true joint effort on the part of both the Federal Government and the States and their local governments."

project during the tax years 1973–1974 and 1974–1975. I would, therefore, reverse the judgment appealed from and grant the petition in all respects.